IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>DWAYNE WHITE,<br><br>    Defendant. | Case No. 09 CR 687-4<br><br>Judge Harry D. Leinenweber |

### MEMORANDUM OPINION AND ORDER

Defendant Dwayne White's Motion for Compassionate Release pursuant to the First Step Act, 18 U.S.C. § 3582(c)(1)(A) (Dkt. No. 372) is granted. White's sentence is reduced to time served. This Order is stayed for fourteen (14) days for the verification of White's residence, to finalize his release plan, to make appropriate travel arrangements, and to ensure White's safe release.

### I. BACKGROUND

The Government previously prosecuted individuals arrested in the course of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") sting operations known as a "stash house raids." This now abandoned practice deployed an undercover ATF agent to approach a target or targets with the opportunity to rob nonexistent drug stash houses and then arrest successful recruits

prior to the proposed raid. The individuals who agreed to the robbery were charged based on the fabricated circumstances that had been communicated by the ATF prior to arrest, often resulting in lengthy mandatory minimum sentences. The ATF has now abandoned these types of operations. In the mid-2010's, the Government altered its charging practices as it related to any defendants still awaiting trial on a stash house raid case. It is through this lens that the Court views White's Motion.

In the summer of 2009, an undercover ATF agent approached Leslie Mayfield with the opportunity to rob a fictious stash house. (Presentence Investigation Report ("PSR") at 7, Dkt. No. 278.) The undercover agent posed as a courier for a drug trafficking organization. (*Id.*) The agent explained that the organization's stash house typically had between 20 and 30 kilograms of cocaine on site. (*Id.*) The agent further explained that he usually observed three armed men guarding the stash house. (*Id.* at 7–8.) In response, Mayfield said he would have to obtain firearms for the purpose of the robbery. (*Id.* at 8) Once Mayfield agreed to plan the robbery with the undercover agent, he recruited Montreece Kindle, Nathan Ward, and a man called "New York" to assist. (*Id.*)

On the day of the robbery, August 10, 2009, "New York" abandoned the scheme. (Mot. at 3, Dkt. No. 372.) As a result, Mayfield needed to quickly find a replacement. After unsuccessfully reaching out to several people, Mayfield turned to

a close friend and someone he knew he could trust—White. (7/12/10 Tr. at 814:16–20, Dkt. No. 239.) Recollections differ regarding White's knowledge of the specifics of the plan. Mayfield testified that he did not explain the plan to White. (*Id.* at 815:16–816:3.) The undercover ATF agent, however, stated that he confirmed White understood the plan for the robbery. (PSR at 8.) In any event, the agent took the time to explain the plan to White on the date the robbery was to take place, and White agreed to join the scheme. (*Id.*) Once the undercover agent confirmed that the group was prepared for the robbery and that the men were armed, the ATF arrested Mayfield and his crew, including White. (*Id.*)

Following his arrest, White was indicted on four counts in connection to the stash house raid. (Indict., Dkt. No. 18.) Counts One and Two charged all four defendants with conspiracy to possess with the intent to distribute five kilograms or more of mixtures containing cocaine in violation of 21 U.S.C § 841(a)(1). (*Id.* at 1–2.) The drug weight that formed the basis for this charge was taken from the undercover ATF agent's representation of the volume of cocaine at the fictitious stash house. Counts One and Two each carried mandatory minimum sentences of ten years imprisonment. 21 U.S.C § 841(b)(1)(A). Count Three charged all four defendants with possession of firearms in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A). (Indict. at 3.) Count Three carried a mandatory minimum sentence of five years to be

served consecutively with any other sentence. 18 U.S.C. § 924(c)(1)(A)(i). Count Seven charged White with possessing a firearm after being convicted of a felony, in violation of 18 U.S.C. § 922(g)(1). (Indict. at 7.) Based on the Indictment, White faced a mandatory minimum sentence of 15 years imprisonment.

Under the applicable version of the Controlled Substances Act, White's statutory mandatory minimum could be increased to twenty years if his conviction occurred "after a prior conviction for a felony drug offense [became] final." 21 U.S.C. § 841(b)(1)(A) (2009). In order to subject White to the increased mandatory minimum, before trial or the entry of a plea agreement the Government was required to file an 851 Notice, which is a document "stating in writing the previous convictions to be relied upon." *Id.* § 851(a)(1).

White maintained his innocence and declined to accept a plea agreement. (Mot. at 4.) In advance of trial, the Government filed an 851 Notice as to White. (851 Notice at 1, Dkt. No. 54.) The 851 Notice relied on White's prior felony drug conviction to seek a 20-year mandatory minimum sentence for Counts I and II of the Indictment. (*Id.* at 1–2.) As a result of the 851 Notice, White then faced a mandatory minimum sentence of 25 years imprisonment.

White proceeded to trial alongside his three co-defendants— Mayfield, Kindle, and Ward. On July 14, 2010, a jury convicted each Defendant on all four counts for which they were indicted.

(7/14/10 Order, Dkt. No. 186.) On April 28, 2011, White was sentenced to 25 years imprisonment—the lowest possible sentence the Court could enter. (4/28/11 Tr. at 7:3-8:24, Dkt. No. 282.)

Only Mayfield successfully appealed his conviction. In 2017, the Seventh Circuit, sitting *en banc,* found that the Court's pre-trial ruling barring invocation of an entrapment defense to be in error. *United States v. Mayfield,* 771 F.3d 417, 420 (7th Cir. 2014). Mayfield's case was remanded for a new trial. *Id.* at 443. Because only Mayfield sought to invoke an entrapment defense, the Seventh Circuit's ruling only vacated his guilty verdict. *Id.* On remand, Mayfield's case was assigned a new case number and he was eventually charged under a superseding information. (Superseding Info., *United States v. Mayfield,* 15-cr-497, Dkt. No. 145.) By 2018 the United States Attorney's Office had instituted new policies for its prosecution of any remaining stash house cases. As a result, the Superseding Information only charged Mayfield with conspiracy to commit robbery in violation of 18 U.S.C. § 1951(a). (*Id.*) Unlike the previously charged drug offenses, the robbery offense did not carry a statutory mandatory minimum penalty. 18 U.S.C. § 1951(a) (imposing a statutory maximum penalty of 20 years imprisonment). In March 2018, Mayfield entered into a plea agreement on the robbery charge. (Plea Agreement, *United States v. Mayfield,* 15-cr-497, Dkt. No. 142.) In June 2018, Mayfield was sentenced to 114 months imprisonment which, when

accounting for good time credit, was essentially time served. (Sent'g Order, *United States v. Mayfield,* 15-cr-497, Dkt. No. 160.) Mayfield was released from prison on June 15, 2018.

White has been incarcerated for nearly 12 years and has not yet completed half of his sentence. On March 1, 2021, White moved for compassionate release pursuant to the First Step Act, 18 U.S.C. § 3582(c)(1)(A). (Dkt. No. 372). The Court now decides that Motion.

## II. LEGAL STANDARD

Pursuant to the First Step Act, 18 U.S.C. § 3582(c)(1)(A), once an inmate has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or after 30 days following "the receipt of such a request by the warden of the defendant's facility," he may move the Court to reduce his term of imprisonment. The Court must consider whether (1) "extraordinary and compelling circumstances" warrant a reduction of the sentence; and (2) a reduction is consistent with the sentencing factors in 18 U.S.C. § 3553(a). *See* 18 U.S.C. § 3582(c)(1)(A)(i); *United States v. Gunn,* 980 F.3d 1178, 1179 (7th Cir. 2020). In 2020, the Seventh Circuit clarified that the policy statements in the United States Sentencing Guidelines ("U.S.S.G.") § 1B1.13 "address[] motions and determinations of the Director, not motions by prisoners." *Gunn,* 980 F.3d at 1180. Because the Sentencing Commission has not updated the policy statements to reflect prisoner-initiated motions, the First Step

Act "sets the standard: only 'extraordinary and compelling reasons' justify the release of a prisoner who is outside the scope of § 3582(c)(1)(A)(ii)." *Id.* Post-*Gunn,* the Court may use, but is not required to use, the policy statements reflected in the comments of U.S.S.G. § 1B1.13 as guidance when exercising their discretion in determining whether extraordinary and compelling circumstances exist for compassionate release. *Id.*

### III. **DISCUSSION**

It is undisputed that White has met the statutory exhaustion requirement, so the Court turns to whether White has established extraordinary and compelling circumstances warranting a reduction of his sentence and if that reduction is consistent with the sentencing factors in 18 U.S.C. § 3553(a). For the reasons set forth below, the Court finds in White's favor on both elements and grants his Motion for Compassionate Release.

#### *1. Extraordinary and Compelling Circumstances*

Prior to the First Step Act, the criteria for compassionate release were narrowly defined by the policy statements in U.S.S.G. § 1B1.13 to include just three circumstances — serious medical reasons, age, and family circumstances. U.S.S.G. § 1B1.13 cmt. n.1(A)-(C). These Sentencing Guidelines comments also include a catch-all provision that permits release if "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions

(A) through (C)." *Id.* § 1B1.13 cmt. n.1(D). These policy statements have not been updated since the First Step Act permitted prisoners to initiate compassionate release motions. *Gunn,* 980 F.3d at 1180. As discussed above, in *Gunn* the Seventh Circuit concluded that because there is no policy statement that applies to prisoner-initiated motions, the Sentencing Guidelines, are not the sole arbiter of the Court's extraordinary and compelling determination. *Id.*

The Seventh Circuit is not alone in recognizing that "the First Step Act freed district courts to exercise their discretion in determining what are extraordinary circumstances." *United States v. Brooker,* 976 F.3d 228, 234 (2d Cir. 2020). Using this broader framework for determining extraordinary and compelling reasons for compassionate release federal courts have considered sentencing disparities, changes in the law, and the injustice of lengthy sentences when granting compassionate release motions. *See Brooker,* 976 F.3d at 238 (remanding for consideration of the defendant's age and the length of his sentence); *see also United States v. McCoy,* 981 F.3d 271, 286 (4th Cir. 2020) (affirming compassionate release based on the length of the defendants' sentences and "the disparity between their sentences and those that Congress deemed appropriate in the First Step Act"); *United States v. Haynes,* 456 F.Supp.3d 496, 514 (E.D.N.Y. 2020) (concluding that the length of the original sentence, the severity

compared to co-defendants, and the harshness compared to current sentencing guidelines warranted a sentence reduction); *United States v. Cano,* No. 95-CR-00481, 2020 WL 7415833, at *6 (S.D. Fla. Dec. 16, 2020) (finding that disparities in sentences, among other things, warranted a sentence reduction). The Court recognizes that, in making this determination, it should not "creat[e] a sort of Wild West in court, with every district judge having an idiosyncratic release policy." *Gunn,* 980 F.3d at 1180. Instead, the Court carefully considers whether White's situation is uniquely compelling such that the Court can grant compassionate release.

The Court now turns to White's sentence. When the undercover ATF agent described the fictitious stash house to Mayfield, he indicated that there could be 20-30 kilograms of cocaine on the premise. (PSR at 7.) As a result, White was indicted and eventually convicted for two drug offenses involving five or more kilograms of cocaine. (7/14/10 Order.) These offenses carried a minimum of ten years imprisonment and were increased to twenty years upon the Government filing an 851 Notice. 21 U.S.C. § 841(b)(1)(A). In short, twenty years of White's mandatory 25-year sentence were based solely on the fictious circumstances described by the undercover ATF agent prior to his arrest.

The inherent inequity in this sentence is revealed when compared to White's co-defendant Mayfield. The undercover ATF

- 9 -

agent approached Mayfield with the fictious raid opportunity. (PSR at 7.) Mayfield then recruited Kindle, Ward, and "New York" and together the men made plans to carry out the robbery. (*Id.*) White was not involved in the planning or preparation for the robbery. (*Id.* at 7–8.) Instead, White was asked to participate at the last minute, when "New York" dropped out. (*Id.* at 8.) Indeed, the first time the undercover ATF agent met White was at the meetup on the day of the planned robbery. (*Id.*) Mayfield, as the orchestrator of the robbery is undoubtedly the most culpable. Because Mayfield's sentence was vacated, he was able to take advantage of the Government's changed policies surrounding stash house raid cases. (*See* Superseding Info. (charging Mayfield with the lesser offense of conspiracy to commit robbery).) Instead of a serving more than 25 years, Mayfield was ultimately re-sentenced to just 9.5 years, which was effectively time served. (Sent'g Order.) As a result, Mayfield is no longer in prison today.

By contrast, White's late arrival to the group makes him the least culpable. White's mandatory 25-year sentence does not reflect the substantially smaller role he played as compared to his co-defendants. White continues to be imprisoned solely based on the now abandoned stash house raids and their accompanying prosecution policies. Considering similar facts in the context of a compassionate release motion, Judge Sharon Johnson Coleman concluded that these are the types of cases where "compassionate

release [is] warranted based on the injustice and unfairness of a prosecution and resultant sentence." *United States v. Conley*, No. 11 CR 0779-6, 2021 WL 825669, at *4 (N.D. Ill. Mar. 4, 2021) (granting compassionate release for a defendant convicted in connection with a stash house raid).

For all these reasons, the Court concludes that there are extraordinary and compelling reasons to reduce White's sentence.

### 2. Sentencing Factors under 18 U.S.C. § 355(a)

Having determined there exists extraordinary and compelling circumstances warranting White's release, the Court turns to the issue of whether such a reduction is consistent with the sentencing factors under 18 U.S.C. § 3553(a). The Section 3553 factors include: (1) the nature and circumstances of the offense; (2) defendant's history and characteristics; (3) the need for the sentence to reflect the seriousness of the offense, deter criminal conduct, protect the public, and provide defendant with educational or vocational training and medical care; (4) the types of sentences available; (5) sentencing recommendations and policy statements from the Sentencing Commission; (6) the need to avoid sentencing disparities; and (7) the need to provide restitution to the victims. *United States v. Dawson,* 980 F.3d 1156, 1162 (7th Cir. 2020); *United States v. Miller,* 834 F.3d 737, 744 (7th Cir. 2016). The Court considers these factors below.

The Court first evaluates the nature and circumstances of the offense and White's culpability in the crime. Armed robbery and narcotics offenses, even if under fictitious circumstances, are serious crimes. As discussed above, however, White had no role in planning the execution of the stash house robbery. (*See, e.g.,* PSR at 7–8.) Instead, he joined the scheme the day the robbery was set to occur. (*Id.* at 8.) In addition, it is not entirely clear that White knew what he was agreeing to do prior to the undercover ATF agent explaining the scheme shortly before White's arrest. (*Compare* 12/16/10 Tr. 815:16–816:3 *with* PSR at 8.) For these reasons, the Court finds White to be the least culpable of his co-defendants.

The Court also considers the need for the sentence to reflect the severity of the offense and deter future criminal prosecutions. To start, one reason the Government no longer pursues the fictitious stash house prosecutions is because the charged offenses were based on fictitious drug weights that dramatically overstated the severity of the actual conduct. Nowhere is this made clearer than the Government's decision to reduce Mayfield's charge to conspiracy to commit robbery—a charge that did not carry a mandatory minimum sentence. (*See* Superseding Info.) Viewed in this light, White's sentence already overstates the severity of the offense conduct.

Moreover, White serving the remainder of his 25-year sentence is not likely to deter future criminal conduct, by the general public or White. Starting with the general public, stash house robberies occurred and continue to occur outside of the ATF's sting operations. The length of White's sentence, and others like it, was crafted in part to deter any criminal actor from engaging in this type of conduct. Here, the Court concludes that White serving just 12 years of his sentence will not impact the deterring purpose of the initial sentence. This is particularly true where White's release is based on his unique circumstances.

As to White, the Court is persuaded by his rehabilitative conduct over the course of his imprisonment. White has no disciplinary incidents on his record and "has a good rapport with staff and other inmates." (BOP Records at 3, Mot., Ex. H, Dkt. 373-1.) In 2012 White earned his GED and since then has taken more than 25 courses on topics ranging from time management and financial literacy to self-image and victim impact. (*Id.* at 1–2.) White's coursework demonstrates that he has taken serious and meaningful steps to build the skill set necessary to be successful post-release. White also has worked a variety of jobs within the Bureau of Prisons. (Mot. at 7.) He is currently working as a recreation orderly and "receives good work reports." (BOP Records at 1.) The steps White has taken towards rehabilitation support release.

The Court also considers White's personal circumstances and his proposed release plan. White proposes a detailed release plan that articulates how he plans to successfully transition out of incarceration. (Release Plan, Mot., Ex. I, Dkt. No. 373-2.) White intends to live with his aunt and uncle, who will "happily welcome him" into their home and support his reentrance into society. (*Id.* at 2; Neal Ltr. at 1, Mot., Ex. J, Dkt. No. 372-9.) A review of this home by a licensed clinical social worker concluded it would be a "safe and appropriate placement for Mr. White. (Release Plan at 2.) His new home will be in close proximity to his daughter and mother, two key pieces of White's described support system. (Mot. at 8.) Indeed, despite being incarcerated for her entire life, White has developed and maintained a strong relationship with his daughter. (*See, e.g.,* White Letter at 4–5, Mot., Ex. A, Dkt. No. 372-2; Dee Ltr. at 1–2, Mot., Ex. G, Dkt. No. 372-8; Mason Ltr. at 1, Mot., Ex. C, Dkt. No. 372-4; D. White Ltr. at 2, Mot. Ex. D, Dkt. No. 372-5.)

White also has two job offers: one at Superior Medical Solutions ("SMS") and the other at Bzzz Delivery Services. (Release Plan at 3–4.) Notably, SMS has offered White full-time employment, with the possibility for overtime, as well as full benefits, including medical and dental insurance, a 401k, profit-sharing, and vacation time. (Sawyer Ltr. at 1, Mot., Ex. K, Dkt. No. 372-10.) White's strong network of support as well as his opportunities

to be immediately employed to provide for himself and his daughter supports his release from prison.

Finally, and most significantly, the Court considers the disparity in sentencing. White's 25-year sentence is more than double Mayfield's 114-month sentence. As discussed above, this disparity is inequitable considering Mayfield was the ATF's target and White's minimal participation.

Additionally, any danger associated with releasing White from prison will be mitigated by ten years of supervised release. The ten-year period of supervised release provides White with the means to be successful in his transition upon release while the United States Probation Office retains a significant role in ensuring White abides by terms of his supervised release.

For all these reasons, the Court concludes that reducing White's sentence is consistent with the Section 3553 sentencing factors.

## IV. **CONCLUSION**

For the reasons stated herein, the Court, in its discretion, grants White's Motion for Compassionate Release pursuant to the First Step Act, 18 U.S.C. § 3582(c)(1)(A)(i). White's sentence is reduced to time served. This order is stayed for fourteen (14) days for the verification of White's residence, to finalize his

release plan, to make appropriate travel arrangements, and to ensure White's safe release.

**IT IS SO ORDERED.**

                                        Harry D. Leinenweber, Judge
                                        United States District Court

Dated: 8/5/2021